**Lewis v. Bayer AG**

*Michael D. Fishbein, Arnold Levin* and *Frederick S. Longer,* for plaintiffs.

*Albert G. Bixler, Hope S. Freiwald, Aline Fairweather, Alison T. Conn* and *Kirstin J. Miller,* for defendants.

BERNSTEIN, *J.,* November 18, 2004—Presently before this court is plaintiffs' motion for class certification arising from the ingestion of Baycol (also known as Cerivastatin), a cholesterol reducing drug. Pursuant to Pennsylvania Rule of Civil Procedure 1710(a), this court accompanies its order with the following findings of fact, conclusions of law, and discussion.

## FINDINGS OF FACT

(1) Plaintiff Arthur Conners [Class I] is a citizen of the Commonwealth of Pennsylvania. Conners was prescribed, purchased and ingested Baycol until August 2001. Conners has not been diagnosed as having rhabdomyolysis or any other kidney disease. Plaintiffs allege that Conners is at an increased risk for developing such condition as a result of his ingestion of Baycol. (Comp. ¶3(a).)

(2) Plaintiff Milton Angert [Class I] is a citizen of the Commonwealth of Pennsylvania. Plaintiff was prescribed, purchased and ingested Baycol until August 2001. Plaintiffs allege that Angert is at an increased risk

for developing such condition as a result of his ingestion of Baycol. (Comp. ¶3(c).)

(3) Plaintiff Eugene Lewis [Class III] is a resident of the state of Florida. Lewis was prescribed, purchased and ingested Baycol. Plaintiffs allege that Lewis was diagnosed as having rhabdomyolysis and is at risk of developing other medical conditions in the future. (Comp. ¶3(d).)

(4) Plaintiff Naomi Carroll [Class IV] is a citizen of the Commonwealth of Pennsylvania. Carroll was prescribed, purchased and ingested Baycol. Plaintiffs allege that Carroll required medical treatment due to debilitating pain throughout her body as well as visible swelling and other medical manifestations. (Comp. ¶3(g).)

(5) Plaintiff Frank R. De Luca [Class IV] is a citizen of the Commonwealth of Pennsylvania. De Luca was prescribed, purchased and ingested Baycol. Plaintiffs allege that De Luca has injuries as a result of Baycol use. (Comp. ¶3(j).)

(6) Plaintiff William Shaw [Class IV] is a citizen of the Commonwealth of Pennsylvania. Shaw was prescribed, purchased and ingested Baycol. Plaintiffs allege that Shaw has received medical treatment due to debilitating pain in his body as well as visible swelling and other medical manifestations. (Comp. ¶3(k).)

(7) Plaintiff Philip Roy [Class III] is a citizen of the state of Louisiana who resides in Louisiana. Roy was prescribed, purchased and ingested Baycol. Plaintiffs allege that Roy has symptoms of rhabdomyolysis and has liver damage. (Comp. ¶3(l).)

(8) Plaintiff Lisa Frost [Class I] is a citizen and resident of the Commonwealth of Pennsylvania. Frost was prescribed, purchased and ingested Baycol until August 2001. Plaintiffs allege that Frost has not been diagnosed as having rhabdomyolysis or any other kidney disease, but is at an increased risk of developing such conditions as a result of her ingestion of Baycol. (Comp. ¶3(m).)

(9) GlaxoSmithKline PLC is a foreign corporation with its principal place of business in Philadelphia. GlaxoSmithKline PLC was created on December 27, 2000 as a result of a merger between Glaxo Wellcome and SmithKline Beecham Corporation. GlaxoSmithKline PLC was allegedly engaged in the business of testing, manufacturing, labeling, licensing, marketing, distributing, promoting and/or selling Baycol either directly or indirectly through third parties. (Comp. ¶6.)

(10) GlaxoSmithKline, a Pennsylvania corporation, is allegedly engaged in the business of testing, manufacturing, labeling, licensing, marketing, distributing, promoting and/or selling Baycol. (Comp. ¶7.)

(11) Bayer AG, Bayer Corporation, GlaxoSmithKline PLC, and GlaxoSmithKline sell, promote and distribute Baycol throughout the United States and in foreign countries. (Comp. ¶4.)

(12) Cerivastatin was originally approved by the FDA and cleared marketing on June 26, 1997. (Comp. ¶15.) The drug was originally approved in dosages of 0.2 mg. and 0.3 mg. (Comp. ¶15.)

(13) In July 1997, Bayer and SmithKline Beecham entered into a co-promotion agreement for Cerivastatin which obligated SmithKline Beecham to provide a mar-

keting, sales report and other services in conjunction with Cerivastatin. (Comp. ¶22.)

(14) As of February 18, 1998, Bayer and SmithKline Beecham made Cerivastatin available under the marketed name Baycol. Baycol is a cholesterol lowering drug. (Comp. ¶49.)

(15) On May 24, 1999, Bayer received approval from the FDA to increase the dosage to 0.4 mg. (Comp ¶28.)

(16) On July 23, 2000, Bayer received approval to increase its dosage to 0.8 mg. *Id.*

(17) Following the launch of Baycol, Bayer informed the FDA of reports of rhabdomyolysis in Baycol users by filing adverse event reports. (Dep. Felix S. Monteagudo, M.D. vice president of Drug Safety Assurance at Bayer Corp., exhibit 26 at 572-82.)

(18) Rhabdomyolysis is an acute, sometimes fatal disease, marked by the destruction of muscles. (Comp. ¶31-31.) Patients who suffer from rhabdomyolysis normally experience severe muscle aches, weakness and reddish or brownish urine caused by the excretion of the muscle protein myoglobin. (Dfts. expert report, exhibit 4.)

(19) Bayer sought and obtained approval from the FDA to amend Baycol's labeling on six occasions. (Dfts. exhibits 10, 6, 19, 13, 14, 9, 21, 15 and 16.)

(20) Approximately 700,000 consumers have used Baycol and 10.6 million new and refilled prescriptions have been dispensed for Baycol in the year 2000. (Comp. ¶52.)

(21) Baycol is a statin drug. Statin drugs are cholesterol-lowering drugs that operate by blocking a specific

liver enzyme that is involved in the synthesis of cholesterol. (Comp. ¶¶11, 12.)

(22) Plaintiffs allege that statin drugs generally and Baycol specifically cause the membranes of skeletal muscle tissue to leak or release myoglobin, and myoglobin is then absorbed into the blood. (Comp. ¶¶31-33.) The function of myoglobin in the muscle tissue is to receive oxygen from the blood and to circulate oxygen throughout the muscles. Once muscle tissue releases myoglobin into the blood stream muscle cannot hold onto oxygen and weakness and pain in the muscle results. One of the complications of the release of the myoglobin into the blood is kidney or renal failure. Increased levels of myoglobin in the kidneys are responsible for blocking the kidneys and causing renal failure. (Comp. ¶¶31-33.)

(23) The risk of rhabdomyolysis is greater in patients taking a statin drug concurrently with gemfibrozil (Lopid), an antihyperlipidemic drug, which decreases or reduces the fat in the blood and lowers cholesterol as well. (Comp. ¶33.)

(24) On August 8, 2001, Bayer voluntarily removed Baycol from the market. (Comp. ¶¶49-51.) Concurrent with the withdrawal of Baycol from the market, the United States Food and Drug Administration issued a "talk paper" that stated it had received reports of 31 deaths due to severe rhabdomyolysis associated with the use of Baycol, 12 of which involved concomitant gemfibrozil use. *Id.*

(25) In addition to rhabdomyolysis, plaintiffs also allege that Baycol lowers the liver's ability to produce the coenzyme Q10 (CoQ10). (Plts. exhibit 1 affidavit of

Emile G. Bliznakov M.D.) CoQ10 is essential in the human body for cells to produce energy. (*Id.* at 25.) According to plaintiffs' expert, the reasons for CoQ10 depletion include the increased use of drugs that alter the cholesterol biosynthetic pathway, and therefore inhibit the biosynthesis of other vital products of this pathway, including CoQ10. (*Id.* at 221.) Baycol is in the class of drugs which deplete CoQ10. (*Id.*)

(26) The risks of CoQ10 depletion includes congestive heart failure, high blood pressure, angina, mitrovalve prolapse, stroke, cardiac arrhythmias, cardiomyopathy, lack of energy, gingivitis and generalized weakening of the immune system. (*Id.* at 26.) Plaintiffs allege that it is imperative during or after extended therapy with statins, testing be done to identify depleted CoQ10 levels and supplements should be administered to support cellular bioenergentic demand as well as minimize potential lipid periozidative insult. (*Id.*)

(27) Plaintiffs' expert, Emile Bliznakov, opines that detecting and treating CoQ10 can reduce the risk of death from a cardiac event as well as myalgia and myopathy. *Id.* The depletion can be detected relatively inexpensively with no health risk through existing and accepted technology such as a blood screen. (*Id.*)

(28) Plaintiffs allege that defendants knew as early as 1994 that Baycol depleted CoQ10 levels yet never warned of this effect which can lead to rhabdomyolysis, myalgia, myopathy and/or congestive heart failure. (*Id.*)

(29) Plaintiffs contend that early detection of CoQ10 depletion is medically useful for proper diagnosis, treatment and prevention of injury.

(30) Many, if not most, of the 700,000 consumers of Baycol have not been diagnosed with injury causally related to Baycol use.

(31) Plaintiffs filed this class action on behalf of the following proposed classes:

"Class I—All persons in the Commonwealth of Pennsylvania, or their estates, administrators or other legal representatives, heirs or beneficiaries, who were prescribed and ingested the drug, Baycol, also known as Cerivastatin. This class seeks, among other relief, medical monitoring benefits for inter alia, testing for CoQ10 depletion, elevated CK levels and a chest x-ray to determine to what extent they may suffer from latent injury or may develop injury in the future in order to provide timely appropriate medical care. Incidental to the court-supervised monitoring program, plaintiffs seek to obtain epidemiological research benefits for scientists to further understand the effects of Baycol and other equitable relief including restitution for the cost of the drug. Excluded from this class are the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs and successors.

"Class II—All persons in the United States, its possessions and territories or their estates, administrators or other legal representatives, heirs or beneficiaries who were prescribed and ingested the drug, Baycol, also known as Cerivastatin. This class seeks, among other relief, medical monitoring benefits for inter alia, testing for CoQ10 depletion, elevated CK levels and a chest x-ray to determine to what extent they may suffer from latent injury or may develop injury in the future in order

to provide timely appropriate medical care. Incidental to the court-supervised monitoring program, plaintiffs seek to obtain epidemiological research benefits for scientists to further understand the effects of Baycol and other equitable relief including restitution for the cost of the drug. Excluded from this class are the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs and successors. Also excluded from this class are the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs, and successors.

"Class III—All persons in the United States, its possessions and territories, or their estates and administrators or other legal representatives, heirs or beneficiaries who were prescribed and ingested the drug, Baycol, also known as Cerivastatin, who now suffer from personal injury. This class represents all individuals who have suffered pain, swelling, debilitation, and other medical injuries. Included in this class are spouses and others entitled to loss of consortium as well as dependents and others entitled to recover under the wrongful death or survival statutes. This class seeks damages for personal injury, wrongful death, loss of consortium, etc.

"Class IV—All persons in the Commonwealth of Pennsylvania, its possessions and territories, or their estates, administrators or other legal representatives, heirs or beneficiaries, who were prescribed and ingested the drug, Baycol, also known as Cerivastatin, who now suffer from personal injury. This class represents all individuals who have suffered pain, swelling, debilitation, and others entitled to loss of consortium, as well as de-

pendents and others entitled to recover under the wrongful death or survival statutes. This class seeks damages for personal injury, wrongful death, loss of consortium, etc."

(32) In the complaint, Class I brings claims for medical monitoring, violation of the Unfair Trade Practices Consumer Protection Law (UTPCPL) and unjust enrichment.

(33) Class II brings claims for medical monitoring, violation of the UTPCPL and unjust enrichment.

(34) Class III brings claims for negligence and unjust enrichment.

(35) Class IV brings claims for negligence and unjust enrichment.

## DISCUSSION

The sole issue before this court is whether the prerequisites for certification as stated in Pa.R.C.P. 1702 are satisfied. The purpose behind class action suits is "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996). For a suit to proceed as a class action, Rule 1702 of the Pennsylvania Rules of Civil Procedure requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

Rule 1708 of the Pennsylvania Rules of Civil Procedure requires:

"In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]

"(a) Where monetary recovery alone is sought, the court shall consider

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would con-

front the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

"(b) Where equitable or declaratory relief alone is sought, the court shall consider

"(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

"(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

"(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b)."

The burden of showing each of the elements in Rule 1702 is initially on the moving party. This burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.' " *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985). The moving party need only present evidence sufficient to make out a prima facie case "from which the court can conclude that the five class certification requirements are met." *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153-54 (Pa. Super. 2002) (quoting *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982)).

In other contexts, the prima facie burden has been construed to mean "some evidence," "a colorable claim," "substantial evidence," or evidence that creates a rebuttable presumption that requires the opponent to rebut demonstrated elements. In the criminal law context, "the prima facie standard requires evidence of the existence of each and every element . . . ." *Commonwealth v. Martin,* 727 A.2d 1136, 1142 (Pa. Super. 1999), *alloc. denied,* 560 Pa. 722, 745 A.2d 1220 (1999). However, "the weight and credibility of the evidence are not factors at this stage . . . ." *Commonwealth v. Marti,* 779 A.2d 1177, 1180 (Pa. Super. 2001).

In the family law context, "the term 'prima facie right to custody' means only that the party has a colorable claim to custody of the child." *McDonel v. Sohn,* 762 A.2d 1101,

1107 (Pa. Super. 2000). Similarly, in the context of employment law, the Commonwealth Court has opined that a prima facie case can be established by "substantial evidence" requiring the opposing party to affirmatively rebut that evidence. See *e.g., Williamsburg Community School District v. Commonwealth of Pennsylvania, Pennsylvania Human Rights Commission,* 99 Pa. Commw. 206, 512 A.2d 1339 (1986).

Courts have consistently interpreted the phrase "substantial evidence" to mean "more than a mere scintilla," but evidence "which a reasonable mind might accept as adequate to support a conclusion." *SSEN Inc., v. Borough Council of the Borough of Eddystone,* 810 A.2d 200, 207 (Pa. Commw. 2002). In *Grakelow v. Nash,* 98 Pa. Super. 316 (1929), a tax case, the Superior Court said: "To ordain that a certain act or acts shall be prima facie evidence of a fact means merely that from proof of the act or acts, a rebuttable presumption of the fact shall be made; . . . it attributes a specified value to certain evidence but does not make it conclusive proof of the fact in question."

Class certification is a mixed question of fact and law. *Debbs v. Chrysler Corp.,* 810 A.2d at 154 (Pa. Super. 2002). The court must consider all the relevant testimony, depositions and other evidence pursuant to Rule 1707(c). In determining whether the prerequisites of Rule 1702 have been met, the court is only to decide who shall be the parties to the action and nothing more. The merits of the action and the plaintiffs' right to recover are excluded from consideration. 1977 Explanatory comment to Pa.R.C.P. 1707. Where evidence conflicts, doubt should be resolved in favor of class certification. In mak-

ing a certification decision, "courts in class certification proceedings regularly and properly employ reasonable inferences, presumptions, and judicial notice." *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454. Accordingly, this court must refrain from ruling on plaintiff's ultimate right to achieve any recovery, the credibility of the witnesses and the substantive merits of defenses raised.

"The burden of proof to establish the five prerequisites to class certification lies with the class proponent; however, since the hearing on class certification is akin to a preliminary hearing, it is not a heavy burden." *Professional Flooring Co. v. Bushar Corp.,* 61 D.&C.4th 147, 153 (Montg. Cty. 2003), citing *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153 (Pa. Super. 2002); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982). See also, *Baldassari v. Suburban Cable TV Co.,* 808 A.2d 184, 189 (Pa. Super. 2002); *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 501 A.2d 635 (1985). The prima facie burden of proof standard at the class certification stage is met by a qualitative "substantial evidence" test.

Our Superior Court has instructed that it is a strong and oft-repeated policy of this Commonwealth that decisions applying the rules for class certification should be made liberally and in favor of maintaining a class action. *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 407, 615 A.2d 428, 431 (1992). See also, *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454, citing and quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir. 1968) ("in a doubtful case . . . any error should be committed in favor of allowing the class action").

Likewise, the Commonwealth Court has held that "in doubtful cases any error should be committed in favor of allowing class certification." *Foust v. SEPTA,* 756 A.2d 112, 118 (Pa. Commw. 2000). This philosophy is further supported by the consideration that "[t]he court may alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik,* 305 Pa. Super. at 129, 451 A.2d at 454.

Within this context, the court will examine the requisite factors for class certification.

## I. *Numerosity*

To be eligible for certification, appellant must demonstrate that the class is "so numerous that joinder of all members is impracticable." Pa.R.C.P. 1702(1). A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should such potential plaintiffs sue individually." *Temple University v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 members sufficient); *ABC Sewer Cleaning Co. v. Bell of Pa.,* 293 Pa. Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin Inc. v. Bell Telephone Company of Pennsylvania,* 291 Pa. Super. 40, 435 A.2d 208 (1981) (204 plaintiffs sufficiently numerous). Appellant need not plead or prove the actual number of class members, so long as he is able to "define the class with some precision" and provide "sufficient indicia to the court that more

members exist than it would be practicable to join." *Janicik,* 305 Pa. Super. at 132, 451 A.2d at 456.

In the case at bar, plaintiffs seek to certify four classes: (1) Class I—a medical monitoring class for all persons in the Commonwealth of Pennsylvania who were prescribed and ingested Baycol but have not suffered injury; (2) Class II—a medical monitoring class for all persons in the United States who were prescribed and ingested Baycol but have not suffered injury; (3) Class III—a personal injury class for all persons in the United States who now suffer from personal injury, pain, swelling, debilitation and other medical injuries; and (4) Class IV—a personal injury class for all persons in the Commonwealth of Pennsylvania who now suffer from personal injury, pain, swelling, debilitation and other medical injuries.

Plaintiffs allege that approximately 700,000 consumers have ingested Baycol and that 10.6 million new and refilled prescriptions have been dispensed in the year 2000. Defendants do not contest numerosity.

The plaintiffs have satisfied the numerosity requirement for class certification of all proposed classes.

## II. *Commonality*

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa.R.C.P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent." *Janicik, supra* at 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each

plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). However, where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. *Janicik, supra* at 133 n.5, 451 A.2d at 457 n.5.

"While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 452, 500 A.2d 1137, 1142 (1985). In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. "Once a common source of liability has been clearly identified, varying amounts of *damages* among the plaintiffs will not preclude class certification." See *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). (emphasis in original) Where there exists intervening and possibly superseding causes of damage however, liability cannot be determined on a class-wide basis. *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. 222, 231, 530 A.2d 499, 504 (1987).

Plaintiffs argue that questions of law and fact common to the class exist. Defendants claim that individual issues of law and fact exist and predominate. After reviewing the class action complaint filed in this matter along with the deposition testimony, medical records of the representative plaintiffs and all other documents exhibits and the argument of counsel, this court finds that

individual issues of law and fact exist and predominate as it pertains to all the claims presented by Class II, Class III, and Class IV and therefore the commonality requirement is not satisfied. The court finds that only the claims presented by Class I do satisfy the commonality requirement of Rule 1702(a)(2).

## A. Class III and Class IV Claims Presents Individual Questions of Fact

The facts surrounding Class III and Class IV negligence claims demonstrates that proof as to one claimant would not be proof as to all. A myriad of individual causation inquiries exist. These inquiries must necessarily include, but are not limited to, family history, preexisting medical history, age, gender, lifestyle, quantity of Baycol ingested, date of prescription, duration of the course of treatment, whether Baycol was used alone or in conjunction with another drug, what if any warning was given to the individual consumer by the physician, whether warnings regarding Baycol were received by the individual claimant's physician, which of different Baycol labels is applicable and most importantly whether any injury is causally related to Baycol use. Analysis of these issues may further reveal individualized intervening or superseding causes of injury.

Although this case involves the use of only one product and one manufacturer, the failure to warn claims involve date sensitive factual determinations of what the defendant knew or should have known, what the claimant physician knew or should have known, the effect of warning label changes and of course the legal cause of

any injury. The need for individualized determinations of liability predominates and therefore defeat any claim for commonality.

The nature of the individualized decisions is demonstrated by the specific health histories of the individual plaintiffs. Mr. Lewis, a Class III plaintiff, has a long history of cardiac problems predating his use of Baycol. Mr. Lewis was prescribed 0.3 mg. of Baycol in combination with gemfibrozil for approximately eight months starting in late 1999 or early 2000. At the time, the Baycol warning labels warned against co-prescription of the medications. Mr. Lewis attributes weakness, pain and depression as well as the implantation of the pacemaker to his ingestion of Baycol.

Philip Roy, a Class III plaintiff, had elevated enzymes which predate Mr. Roy's Baycol use by at least four years and was diagnosed with Hepatatis B. Mr. Roy was prescribed 0.4 mg. of Baycol which he discontinued after experiencing stomach cramps. At the time, he was also taking Zocor and gemfibrozil which he also discontinued for stomach cramps. Mr. Roy attributes leg, back and neck cramps to Baycol.

Naomi Carroll, a Class IV plaintiff, has a history of various musculoskeletal complaints dating to 1996. Ms. Carroll ingested 0.4 mg. of Baycol from December 2000 through August 2001. Ms. Carroll attributes debilitating pain, muscle weakness, cramps, atrophy, impairment of mobility, dizziness, nausea, swelling, stress and anxiety to Baycol.

Lastly, William Shaw, a Class IV plaintiff, ingested 0.4 mg. of Baycol from March to August 2001. Mr. Shaw

attributes leg and muscle pain, ankle and foot swelling and dizziness as well as the need for orthopedic devices for his shoes to Baycol.

Since numerous individual issues exist, defendants' liability as to each plaintiff must be resolved on a case-by-case basis. Indeed thousands of such personal injury cases have been filed across the country, in excess of two thousand in Philadelphia alone. Accordingly, Class III and Class IV's negligence claims lack factual commonality.

## B. Class II and Class III—Questions of Law

Individual issues of law predominate and bar certification of the nationwide Medical Monitoring Class (Class II) and the nationwide Injury Class (Class III). The law applicable to these national classes differs from jurisdiction to jurisdiction. Plaintiffs argue alternatively that either no conflict of law exists or if a conflict does exist, the Pennsylvania choice of law analysis requires this court to apply Pennsylvania law. As discussed below, a conflict of law does exist with respect to Class II's medical monitoring claim, violation of the UTPCPL, and unjust enrichment as well as Class III's unjust enrichment claim. Moreover, after conducting the applicable choice of law analysis, this court concludes that the substantive law applicable to the putative classes should be the law of the jurisdiction in which each class member was prescribed and sold Baycol.

Pennsylvania choice of law analysis entails a determination of whether the laws of the competing states actually differ. If the laws of the competing states do not dif-

fer, no further analysis is necessary. If a conflict is present, Pennsylvania courts utilize the approach set forth in the Restatement (Second) of Conflicts §145. *Troxel v. A.I. duPont Institute,* 431 Pa. Super. 464, 468, 636 A.2d 1179, 1181 (1994). The relevant inquiry under this standard is not the number of contacts each litigant has with a state but the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law. The following factors may be considered in the analysis: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) and the place where the relationship between the parties is centered. *Laconis v. Burlington County Bridge Commission,* 400 Pa. Super. 483, 492, 583 A.2d 1218, 1222-23 (1990). The conflicting interests of each state must be analyzed within the context of the specific facts at issue in a particular case. Additionally, the weight of a particular state's contact must be measured on a qualitative rather than a quantitative scale. *Cipolla v. Shaposka,* 439 Pa. 563, 566, 267 A.2d 854 (1970).

### 1. *Conflict of law*

### a. Class II—Medical monitoring

Plaintiffs seek certification of a national medical monitoring class. The elements of a medical monitoring claim are not uniform among the states. Some states require a

plaintiff to show a present physical injury. *Dhamer v. Bristol-Myers Squibb Co.,* 183 F.R.D. 520, 533 (N.D. Ill. 1998) (citing *Ball v. Joy Technologies Inc.,* 958 F.2d 36, 39 (4th Cir. 1991) (West Virginia and Virginia requires that the plaintiffs demonstrate that they are suffering from a present, physical injury before they are entitled to recover medical surveillance costs)). Other states do not require any present injury, *id.* (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 786-87 (3d Cir. 1994) (interpreting Pennsylvania law to set forth a four-step test to determine when medical monitoring is appropriate, physical injury not a necessary element)). Some states do not even recognize a cause of action for medical monitoring. *Id.*

Plaintiffs attached to their reply brief a survey of medical monitoring among the states. (Exhibit A to plaintiffs' reply brief.) The survey confirms that medical monitoring is not a uniform concept among the states. The survey demonstrates that a handful of courts have rejected the medical monitoring claim completely, a minority of courts have recognized medical monitoring as an independent cause of action, others allow medical monitoring only as an element of damages when the plaintiff has sustained a physical injury and some states have not yet ruled on the issue. Since the elements of medical monitoring are not uniform, a conflict of law exists.

b. Class II and Class III—Unjust enrichment

The proposed plaintiffs for Class II and Class III also allege a claim for unjust enrichment. Like plaintiffs' medical monitoring claim, the law of unjust enrichment

varies from state to state. See *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 500 (S.D. Ill. 1999). Some states do not specify the misconduct necessary to proceed on the claim, while others require that the misconduct include dishonesty or fraud. *Id.* (citing *Johnson v. American National Insurance Co.,* 126 Ariz. 219, 613 P.2d 1275 (Ariz. App. 1980)). Other states only allow a claim of unjust enrichment when no adequate legal remedy exists, *id.* (*Cantor Fitzgerald L.P. v. Cantor,* 724 A.2d 571 (Del. Ch. 1998)). Some states permit an equitable defense of unclean hands. Like Class II's national claim for medical monitoring, a conflict of law also exists for Class II and Class III's national claim for unjust enrichment.

### c. Class II—Unfair Trade Practices and Consumer Protection law

The proposed plaintiffs in Class II also seek nationwide certification of their claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL). State consumer protection acts are designed to protect the residents of the states in which a deceptive act occurs or the individual resides and therefore the state where the individual resides has an overriding interest in applying the law of that state. See *Lyon v. Caterpillar Inc.,* 194 F.R.D. 206, 219 (E.D. Pa. 2000). Individual consumer statutes vary on a range of fundamental issues such as the type of practice prohibited, reliance as a required proof, and the forms of evidence necessary to prove reliance. Accordingly, this court concludes that like medical monitoring and unjust enrichment, a conflict of

law exists and the state of sale has the most compelling interests in protecting consumers within that jurisdiction.

### d. Class III—Negligence

Proposed plaintiffs in Class III also seek nationwide certification of their negligence claims against defendants arising from the manufacturing, labeling, marketing and ingestion of Baycol. Product liability law differs in each jurisdiction. Although no per se prohibition exists with respect to class certification in products liability litigation, many courts have "recognized the potential difficulties of 'commonality' and 'management' inherent in certifying products liability class actions." *In re Phenylpropanolamine (PPA) Products Liability Litigation,* 208 F.R.D. 625, 630 (W.D. Wash. 2002) (quoting *Zinser v. Accufix Research Institute Inc.,* 253 F.3d 1180, 1186 (9th Cir. 2001)); see also, *In re American Medical System Inc.,* 75 F.3d 1069, 1084 (6th Cir. 1996) (products liability classes often involve factual and legal issues that vary dramatically amongst individual class members). A substantial number of courts have declined to certify putative products liability classes. *Id.* (citing *Anchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (asbestos)); *Zinser, supra,* 253 F.3d 1180 (pacemakers); *Valentino v. Carter-Wallace Inc.,* 97 F.3d 1227 (9th Cir. 1996) (prescription drug); *American Medical System Inc.,* 75 F.3d 1069 (medical device).

Courts interpret section 402A comment k. (strict liability) of the Restatement (Second) of Torts in a variety of ways. Some jurisdictions except all prescription drugs from strict liability. A drug that is properly manufactured

and accompanied by an adequate warning of the risks known to the manufacturer at the time of sale is not defectively designed as a matter of law. *Freeman v. Hoffman-La Roche Inc.,* 260 Neb. 552, 618 N.W. 2d 827, 836 (2000). A majority of jurisdictions apply comment k. on a case-by-case basis. *Id.* A few courts have not specifically adopted comment k. and have fashioned their own rules on prescription drugs in the same manner as that of all other products. *Id.*

## 2. *The state of occurrence law applies*

After determining that a conflict of law does exist, the court must now determine which state law to apply. Applying the flexible government approach described in section 145 of the Restatement (Second) of Conflicts to the facts of this case, the substantive law applicable to the putative class should be the state law, in which the class member resides, was prescribed and ingested Baycol and where the injury occurred. In this case, Pennsylvania's only contact is the fact that the company does business in Pennsylvania. The contacts of the states where the putative class resides are more substantial and have a stronger interest in applying their applicable law to the sale, prescription and ingestion of pharmaceuticals within its borders, which is the conduct which gave rise to the class members' claims. See *In re Diet Drugs Products Liability Litigation,* 1999 WL 673066, *14 (E.D. Pa. 1999). Each class member's state has a greater interest in having its law applied. Thus, the law of the state in which each class member's claims arose rather than Pennsylvania substantive law must govern the claims of Class II and III.

A drug manufacturer who sells a medication prescribed by a Louisiana physician to a Louisiana resident in Louisiana need not comply with Pennsylvania Product Liability law or face exposure pursuant to that law in a class action case brought in Pennsylvania. To hold that Pennsylvania law applies to that transaction affords Pennsylvania law an extraterritorial scope neither contemplated by the Pennsylvania Legislature in enacting our choice of law rules nor contemplated by our founding fathers in creating our federal form of national government. Such a proposition actually destroys Pennsylvania sovereignty since its effect is to require manufacturers to adhere to the most restrictive standards imposed by any state lest they find that standard applied to their commercial behavior in all states including Pennsylvania. Such a holding affords national jurisdiction to every state legislature. This is not the law. Accordingly, any claim to commonality of law is defeated.

### C. Class IV—Negligence and Unjust Enrichment

In Class IV plaintiffs seek certification of a Pennsylvania state personal injury class under two theories of liability, negligence and unjust enrichment. With respect to the negligence claim, as discussed previously, a predominance of individual issues of fact exist which defeats any claim for commonality. With respect to the unjust enrichment claim, many of the same individualized issues are involved.

" 'Unjust enrichment' is essentially an equitable doctrine." *Schenck v. K.E. David Ltd.,* 446 Pa. Super. 94, 97, 666 A.2d 327, 328 (1995). The elements of unjust en-

richment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Id.* (quoting *Wolf v. Wolf,* 356 Pa. Super. 365, 514 A.2d 901 (1986)). "The application of this doctrine depends on the particular factual circumstances of the case at issue." *Id.* An unjust enrichment class requires answers to the following questions of fact: (1) whether plaintiffs conferred a benefit upon defendants, (2) whether the defendant appreciated the benefit and (3) whether the defendant accepted and retained the benefits under the circumstances that would make it inequitable for the defendant to retain the benefit without payment for value. The responses to these factual questions by the proposed class members will not be uniform as to everyone who consumed Baycol in the state. Determination of the equitable claim of unjust enrichment will require individualized consideration of what the defendant knew when and what warning labels were applicable in comparison to when each class member consumed the medication.

Certification of a statewide Unjust Enrichment Class for those who now suffer from injury due to Baycol ingestion as requested for Class IV presents additional complications. All parties agree that Baycol did reduce cholesterol, and thus was effective for its intended purpose. Thus whether an individual is now suffering or ever will be in fact injured as a result of ingestion (that is whether the allegedly "unsafe" medication actually was unsafe for the individual users) must be causally determined in each individual case. Additionally each injured

class member has presently pending or could have pursued an individual personal injury action. Individualized determinations would be necessary as to whether pending legal action does or could have contained a claim for unjust enrichment. Such a determination could also implicate individual determinations as to the effect of applicable statutes of limitations.

If an individual has suffered injury and has brought an individual personal injury action, that plaintiff, represented by counsel, has made a decision whether or not to include a claim for unjust enrichment as part of that lawsuit. Any proper class description would either require preclusion on an individualized basis of all potential class members who have brought their own lawsuits, or mandate bifurcation of claims. It is dysfunctional in the extreme to bifurcate personal injury actions into a class action for unjust enrichment while claims for all other injuries proceed individually. Those injured individuals who have not yet presented individual actions present similar complications of applicable statutes of limitations and bifurcation of claims should they choose to sue for their personal injuries. Thus, individualized issues predominate and class action treatment cannot be an effective method of adjudication for Baycol unjust enrichment claims generally.

## D. Class I—Commonality Requirement

Class I seeks certification of a class of Pennsylvania residents only. Plaintiffs have sustained their burden of demonstrating that common issues of fact and law exist to satisfy the requirement of commonality as it pertains

to the claims for medical monitoring and as to a limited and narrowly defined class for claims of unjust enrichment. With respect to the claim for violations under the UTPCPL, this court finds that the plaintiffs have failed to satisfy their burden to demonstrate commonality.

## 1. *Medical monitoring*

In *Redland Soccer Club Inc. v. Department of the Army and Department of Defense of the U.S.*, 548 Pa. 178, 696 A.2d 137, 145 (1997), the Pennsylvania Supreme Court articulated the following elements to state a claim for medical monitoring: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by defendants' negligence; (4) as a proximate result of the exposure, plaintiffs have a significantly increased risk of contracting a serious latent disease; (5) a monitoring program procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Id.* 145-46. The injury from which a medical monitoring claimant seeks recovery is the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm. *Id.* Courts prefer that plaintiffs recover these costs through a court supervised and administered trust fund instead of through a lump sum damage award because a trust fund compensates the plaintiff only for the monitoring costs actually incurred, limiting defendants' liability. *Redland* at 189, 696 A.2d at 147.

Plaintiffs seek certification of a Pennsylvania state medical monitoring program for all those who ingested Baycol and are at significantly increased risk for the existence of side effects caused by Baycol. In *In Re Pennslyvania Diet Drugs Litigation,* 41 D.&C.4th 78 (1999), the court addressed a similar request for certification of a medical monitoring claim on behalf of a class of all persons in the Commonwealth who used fenfluranimine and/or dexfenfluramine. The court granted certification of plaintiffs' medical monitoring claim on behalf of all persons in the Commonwealth of Pennsylvania who used fenfluranimine and/or dexfenfluramine and who have not been diagnosed with primary or pulmonary hypertension or valvupathy. The court concluded the following with respect to the commonality requirement of Rule 1702(a)(2):

"common questions of law and fact predominate over individual issues because plaintiffs' claims arise out of similar conduct by the defendants, and the elements of plaintiffs' medical monitoring claim are common to each class member.

"Here, defendants' alleged failure to disclose the adverse side effects of dexfenfluramine and fenfluranimine is common to all class members. The court is confident that further discovery will reveal what defendants knew about the diet drugs' adverse side effects and when they knew it. This information may later preclude recovery for some class members because defendants may prove that they adequately disclosed information about the diet drugs' side effects, and thus their conduct could not have caused the plaintiffs' exposure to the diet drugs. However, the likelihood that some class members may re-

cover while others may not does not make their interests antagonistic." *Id.* at 100-101. (footnotes omitted)

The court determined that the *Redland* requirements presented common questions of law and fact. *Id.* at 101.

The court's reasoning in *In re Diet Drugs* is also applicable to the instant matter. Defendants alleged failure to disclose the adverse side effects of Baycol and the research and data which will be presented to determine whether Baycol is a hazardous substance is common to all class members.

Moreover, the requirements of *Redland* also present common questions of law and fact. All the plaintiffs were exposed to greater than normal background levels since there are no background levels of Baycol exposure. Additionally, whether Baycol is hazardous is common to all class members. Plaintiffs contend that the use of Baycol for any dose and for any duration is hazardous. Baycol has been withdrawn from the market and plaintiffs' expert Emile G. Bliznakov M.D. opines that patients who ingested Baycol in the past should have their blood tested, analyzed and monitored for purposes of determining the current and continuing levels of CoQ10 in their plasma. Declaration of Emile G. Bliznakov M.D. ¶10. Dr. Bliznakov further opines that testing for CoQ10 depletion in the blood is necessary because the depletion of CoQ10 causes rhabdomyolysis and could potentially cause congestive heart failure. *Id.* Rhabdomyolysis and congestive heart failure may also be present in Baycol users who are currently asymptomatic. *Id.*

The recommendation of plaintiffs' expert also creates a common question as to whether the recommended

monitoring program is different from that normally recommended in the absence of exposure and whether plaintiffs are at an increased risk of contracting a serious latent disease. Plaintiffs' expert recommends a blood screen for CoQ10 depletion which is a different type of blood screen than statin users would normally require. Dr. Bliznakov further recommends a chest x-ray and echocardiogram as additional diagnostic testing necessary to be performed upon Baycol users to determine whether the condition of heart failure exists.

According to Dr. Bliznakov

"Detection of CoQ10 depletion and aggressive evaluation, testing and potential treatment is vital to prevent or reduce the risk of permanent health injury. Very often conditions that result from depletion of CoQ10 go unnoticed and are missed by physicians who examine patients on statins and it is my belief that Baycol users should undergo the testing described above. Moreover, providing medical exams of statin users, in particular Baycol users, will alert medical providers to the development or onset of delayed side effects in these patients as a result of their use." *Id.*

The other elements relating to *Redland,* whether a monitoring procedure exists that makes early detection of the disease possible and whether the monitoring program is reasonably necessary to contemporary scientific principles also raise common questions. The recommended monitoring program proposed by plaintiffs applies to all class members regardless of dose or duration. Therefore, it may be decided class-wide whether the recommended monitoring program satisfies *Redland's* elements relating to the medical monitoring protocol.

Accordingly, this court finds that common questions of law and fact exist with respect to the medical monitoring claim for Class I.

## 2. *Unjust enrichment*

Plaintiffs' general claim for unjust enrichment as to Class I presents questions of law and fact which depends upon the dates of ingestion and as set forth above requires numerous individual determinations.

All parties agree that Baycol did reduce cholesterol, and thus was effective. The claim presented by the class is that the medication was not safe and effective. If an individual consumed an effective cholesterol reducing medication which was "unsafe" because of inadequate warnings or because of increased exposure to serious injury and as chance and fate provided in fact suffers no injury, no equitable claim for unjust enrichment can lie. The defendant provided an effective medication and luckily, as to that individual user, also a safe medication. Thus, determination of the general equitable claim of unjust enrichment will also require individualized consideration of what the defendant knew when and what warning labels were applicable in comparison to when each class member consumed the medication; whether an individual was or ever will be in fact injured as a result of ingestion (that is whether the allegedly "unsafe" medication actually was unsafe for the individual users), and whether the class member can bring an individual personal injury action which may contain a claim for unjust enrichment.

If an individual consumed an effective but "unsafe" medication, however, as chance and fate have it suffers

no injury, no equitable claim for unjust enrichment can lie. If an individual has been injured and has brought an individual personal injury action, then counseled plaintiff made a decision whether or not to include a claim for unjust enrichment as part of that lawsuit. Any class would thus require preclusion on an individualized basis of those who have brought individual claims for unjust enrichment; it is dysfunctional in the extreme to bifurcate personal injury actions into a class action for unjust enrichment while all other injuries proceed individually.

As to those whose injuries have not yet materialized but who will eventually learn they have been injured through medical monitoring or otherwise, they will then have the ability to pursue legal action including the counseled decision whether to seek damages for unjust enrichment. Thus, individualized issues predominate and class action treatment is not a proper method of adjudication for Baycol unjust enrichment claims generally.

However, a subclass of Pennsylvania claimants do present common issues. On August 8, 2001 the defendants withdrew Baycol from the market and advised consumers to cease all further use. Common issues of fact and law predominate as to those Pennsylvania consumers who purchased Baycol medication but were advised by the company to discontinue use. Thus, this court finds that a limited class for claims for unjust enrichment satisfies the commonality requirement of rule 1702. Class I plaintiffs who had purchased Baycol which they were told not to use does present common questions of fact and law which satisfies the commonality requirement.

### 3. *UPTCPL*

Plaintiffs' claims under the UTPCPL fail to satisfy the commonality requirement. To recover under the UTPCPL, plaintiffs must prove reliance. See *Skurnowicz v. Lucci,* 798 A.2d 788 (Pa. Super. 2002). A private UTPCPL plaintiff must show that he or she sustained injury as a result of a defendant's unlawful act. *Weinberg v. Sun Company Inc.,* 565 Pa. 612, 777 A.2d 442, 446 (2001). Because reliance is an integral element of any UTPCPL claim, it is an inappropriate vehicle upon which to predicate a class action.

In *Debbs v. Chrysler Corp.,* 810 A.2d 137, 156 (Pa. Super. 2002), the Superior Court said:

"The UTPCPL was addressed by our Supreme Court in *Weinberg, supra.* There, the court held that a plaintiff bringing a private action under the UTPCPL must establish the common-law elements of reliance and causation with respect to all subsections of the UTPCPL. *Weinberg,* 777 A.2d at 446. Our Supreme Court stated: '[t]he UTPCPL's underlying foundation is fraud prevention. Nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common-law elements of reliance and causation.'

"Both fraud and UTPCPL claims were at issue in *Basile, supra.* There, the plaintiffs brought a class action against H & R Block as well as Mellon Bank alleging that the defendants failed to disclose that tax refunds under H & R Block's 'Rapid Refund' program were actually short-term, high interest loans. *Basile,* 729 A.2d

at 577. The plaintiffs alleged, inter alia, fraud and violations of the UTPCPL. *Id.* at 578.

"This court reasoned that, as to the UTPCPL claims, the plaintiffs must show detrimental reliance. The court noted that 'an action under the UTPCPL may not be amenable to class certification due to discrepancies in the respective levels of reliance displayed by individual class members.' *Id.* at 584, citing *DiLucido,* 676 A.2d at 1241. The court held that the plaintiffs need not show individualized detrimental reliance with respect to H & R Block, because H & R Block's fiduciary relationship with the plaintiffs established detrimental reliance as a matter of law. *Id.* On the other hand, Mellon Bank had no such fiduciary relationship with the plaintiffs. *Id.* at 585. Therefore, the court concluded that:

"[The plaintiffs] may not assert the reliance inherent in such a relationship to establish this requirement. Rather, because plaintiffs' claims against Mellon, unlike those against Block, assert conduct outside the confines of an agency relationship, plaintiffs must establish reliance as a matter of fact on the basis of the testimony of individual class members. Because such a showing would vary between class members, plaintiffs' claims against Mellon are not appropriate for treatment as a class action. *Id.* at 585." (footnote omitted)

The court continued:

"As noted above, Rule 1702 requires, for class certification, that 'there are questions of law or fact common to the class.' When determining whether a class action is a fair and efficient means of litigating the dispute, 'one factor to consider is whether common questions of law

or fact predominate over any question affecting only individual members.' Rule 1708(a)(1).

"Our Supreme Court's directions in *Klemow* and *Weinberg,* as well as our own court's directions in *Basile* and *DiLucido,* guide us here. In order to prove both common-law fraud and a violation of the UTPCPL, the plaintiffs must show that they suffered harm as a result of detrimental reliance on Chrysler's fraudulent conduct. See *Klemow,* 352 A.2d at 16 (cause of action for fraud includes a showing that the plaintiff acted in reliance on defendant's misrepresentations and, as such, is not generally appropriately resolved in a plaintiff class action); *Weinberg,* 777 A.2d at 446 (to sustain a private action under the UTPCPL, plaintiffs must show that they suffered 'an ascertainable loss as a result of the defendant's prohibited action'). This court has excused proof of individual detrimental reliance where the defendant has a fiduciary relationship with the plaintiffs. *Basile,* 729 A.2d at 585. Because no fiduciary relationship has been demonstrated between the class and Chrysler to excuse proof of individualized reliance, the individual questions involving reliance and causation would remain a significant barrier to class certification." *Debbs,* 810 A.2d at 157. (footnote omitted)

The Pennsylvania Supreme Court recently remarked that the causation requirement found in all private UTPCPL actions presented "questions of fact applicable to each individual private plaintiff that would be 'numerous and extensive.'" *Weinberg v. Sun Company,* 565 Pa. 612, 777 A.2d 442, 446 (2001). The same is true in this case. Here, plaintiffs would have the burden of establishing that each member of the class was harmed by

the defendants' improper conduct. This would require analysis of the reasons each class member was prescribed Baycol including each class member's medical history. Such a determination would involve innumerable individual questions as to each class member. This cannot be established using class-wide proof. Since the reasons each proposed plaintiff began taking Baycol are different and whether there was any reliance is individualized the UTPCPL is not a proper claim for class certification.

## III. *Typicality*[1]

The third step in the certification test requires the plaintiff to show that the class action parties' claims and defenses are typical of the entire class. The purpose behind this requirement is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members, to ensure that pursuit of their interests will advance those of the proposed class members. *DiLucido v. Terminix International Inc.*, 450 Pa. Super. 393, 404, 676 A.2d 1237, 1242 (1996).

Class I plaintiffs seek a medical monitoring program that will (1) notify individuals who ingested Baycol of the potential harm from Baycol, (2) aid individuals who ingested Baycol in the early diagnosis and treatment of rhabdomyolysis through ongoing testing and monitoring, (3) provide individuals who ingested Baycol in Class

---

1. It is not necessary for this court to consider the remaining requirements for certification as it pertains to Classes II, III and IV negligence claims since plaintiff failed to establish the requirements of Pa.R.C.P. 1702(a)(2), common questions of fact and law.

I with state of the art medical testing, (4) provide for the accumulation and analysis of relevant medical and demographic information from class members, (5) provide for the creation, maintenance and operation of a "registry" in which relevant demographic and medical information concerning all class members can be gathered, maintained and analyzed, (6) provide for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of Baycol-induced side effects and (7) allow for publication and dissemination of all such information to members of Class I and their physicians. Class I specifically seeks testing for CoQ10 depletion, elevated CK levels and chest x-rays to determine to what extent they may suffer from latent injury or may develop injury in the future in order to provide timely appropriate medical care.

The class is defined as those persons who took Baycol that are currently asymptomatic. The named plaintiffs for this class are: (1) Arthur Conner—a resident of Pennsylvania took 0.3 mg. per day from March 1999 to March 2000 and 0.8 mg. Baycol from April to August 2001 suffered pain in the legs and back, stomach problems and headaches; (2) Milton Angert—a resident of Pennsylvania who took 0.4 mg. from November 1999 to late 2000 or early 2001 and 0.8 mg. which he took to August 2001 suffered muscle cramps while taking Baycol; and (3) Lisa Frost—a resident of Pennsylvanian who took 0.4 mg. and 0.8 mg. for an unknown period of time suffered from aches and pains, strokes, thyroid cancer and depression. These named plaintiffs are currently asymptomatic for injuries allegedly due to Baycol ingestion.

Plaintiffs argue that the class representatives' medical monitoring claim is typical of other class members' claims due to common elements such as defendants' design, manufacture, sale, and distribution of a drug that causes rhabdomyolysis and kidney disease and defendants' failure to warn about the association between Baycol use and such diseases, and the need to warn about immediate medical attention. Plaintiffs also argue that the claims are typical since there is no reason to believe that plaintiffs will pursue their own interests to the detriment of the proposed class members.

Defendants argue that the typicality and adequacy requirement are not met because the named plaintiffs have already suffered injuries as a result of taking Baycol, therefore the interests of the named plaintiffs conflict with the interests of the exposure-only members of the putative class. However, defendants have failed to present any diagnostic evidence of any injury sustained by the named plaintiffs due to Baycol ingestion. The medical monitoring claim seeks testing for early detection of serious Baycol-related injury such as rhabdomylosis or congestive heart failure. None of the named plaintiffs are now or have ever been diagnosed as suffering from these potentially fatal diseases although plaintiffs claim they are at higher risk of developing them.

The court finds that the class representatives for Class I medical monitoring claim are typical of those belonging to absent class members. In Pennsylvania, a medical monitoring claim is available to plaintiffs who do not have a presently detectable injury, but are at risk of developing latent disease. *Simmons v. Pacor Inc.,* 543 Pa. 664, 674 A.2d 232 (1996). According to Dr. Bliznakov,

it is not yet established how long it would take the level of CoQ10 in the person's blood to return to normal or safe levels after prolonged statin use without CoQ10 supplements. Testing for CoQ10 depletion in the blood levels of Baycol users is necessary because the depletion of CoQ10 causes rhabdomyolysis and potentially congestive heart failure and these conditions in Baycol users may be present but asymptomatic. Declaration of Emile G. Bliznakov M.D. ¶10. Here, the named representatives have not been diagnosed with rhabdomyolysis and congestive heart failure. However, they have ingested Baycol. A plaintiff's injury in a medical monitoring claim is the cost of regular medical testing and evaluation the plaintiff must undergo in order to detect the injury for which plaintiff is at an increased risk due to defendant's negligence.

Accordingly, since the named plaintiffs have not been diagnosed with rhabdomyolysis or congestive heart failure, the typicality requirement of Pa.R.C.P. 1702(a)(3) has been satisfied.

Class I plaintiffs in a medical monitoring program are those who have yet to suffer injury. If class member plaintiffs in the medical monitoring program remain injury free, those plaintiffs can never have a claim for unjust enrichment because they received an efficacious cholesterol reducing drug and fortunately, for them, a safe one. Therefore, plaintiffs who remain injury free cannot be typical of the class who suffer injury related to their Baycol ingestion. Likewise, should any named plaintiff actually suffer injury they will choose whether or not to

bring an individual claim for personal injury and whether such claim will include a claim for unjust enrichment. Therefore, the proposed class representatives' claims for Class I cannot be typical of the putative class members and a class for unjust enrichment generally is not proper.

The named plaintiffs in Class I and Class IV may be typical of those class claimants for an unjust enrichment claim limited to individuals who purchased Baycol but were advised by the defendant on August 8, 2001 to cease taking the medication and who do not have any individual personal injury action. However, no evidence whatsoever has been presented from which this court can conclude that the named plaintiffs satisfy the typicality requirement for class certification. Although the named plaintiffs had medication which they were told not to use, there is no evidence as to the extent of any personal payment for those medications. There is no evidence whatsoever of record as to whether these individuals, who were taking the medication in August, suffered any monetary loss for unused Baycol purchased prior to August 8, 2001. The cost of those medications may have been covered by insurance or governmental benefits or otherwise obtained without individual payment. Although plaintiff's burden of proof is slight, it applies to each requirement for certification and some scintilla of evidence must be present for there to be a finding of typicality. Accordingly, in the absence of any evidence, this court finds that typicality has not been demonstrated as to the one aspect of the class for the unjust enrichment claim which satisfies the commonality requirement.

## IV. *Adequacy of Representation*

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa.R.C.P. 1702(4). In determining whether the representative parties will fairly and adequately represent the interests of the class, the court shall consider the following:

"(1) Whether the attorney for the representative parties will adequately represent the interests of the class,

"(2) Whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) Whether the representative parties have or can acquire financial resources to assure that the interests of the class will not be harmed." Rule 1709.

"Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." *Janicik,* 305 Pa. Super. at 136, 451 A.2d at 458. Here, defendants do not challenge plaintiffs' counsels' skill and therefore, the court presumes that counsel is skilled in their profession.

"[C]ourts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." *Janicik,* 305 Pa. Super. at 136, 451 A.2d at 458. Defendants argue that the interests of the named plaintiffs conflict with the interests of the exposure-only members of the putative classes because the named plaintiffs have suffered injury. As discussed above, the named class rep-

resentatives for Class I do not suffer from rhabdomyolysis, the injury attributable to Baycol. As a result, the named class representatives' interests do not conflict with those of the proposed putative class. Accordingly, the court finds that no conflict of interest exists.

## V. *Fair and Efficient Method of Adjudication*

The final criteria under Pa.R.C.P. 1702 is a determination of whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708. Since the court has determined that Class I claims for medical monitoring satisfies the other requirements of Pa.R.C.P. 1702 and medical monitoring is a form of equitable relief, it is necessary also to consider subdivisions (a) and (b) of Rule 1708.

### 1. *Predominance of common questions of law and fact*

The most important requirement in determining whether a class should be certified under 1702(a)(5) and 1708(a)(1) is whether common questions of law and fact predominate over any question affecting only individual members. In addition to the existence of common questions of law and fact, plaintiffs must also establish that the common issues predominate. The analysis of predominance under Rule 1708(a)(1) is closely related to that of commonality under Rule 1702(2). *Janick, supra* at 141-42, 451 A.2d at 461. The court adopts and incorporates its analysis of commonality and concludes that

the requirement of predominance as it pertains to the medical monitoring claim for Class I has been satisfied.

## 2. *The existence of serious management difficulties*

Under Pa.R.C.P. 1708(2), a court must also consider the size of the class and the difficulties likely to be encountered in the management of the action as a class action. While a court must consider the potential difficulties in managing the class action, any such difficulties generally are not accorded much weight. Problems of administration alone ordinarily should not justify the denial of an otherwise appropriate class action, for to do so would contradict the policies underlying this device. *Yaffe v. Powers,* 454 F.2d 1362 (1st Cir. 1972). Rather, the court should rely on the ingenuity and aid of counsel and upon its plenary authority to control the action to solve whatever management problems the litigation may bring. *Id.* (citing *Buchanan v. Brentwood Federal Savings and Loan Association,* 457 Pa. 135, 320 A.2d 117, 131 (1974)).

Defendants argue that class treatment would not be fair and reasonable since the proposed classes are permeated with individual fact issues which render class treatment unmanageable. Defendants also argue that the individual plaintiffs have a strong interest in controlling their own claims. The defendants' concerns however are minimized since the Class I statewide class for medical monitoring is the only class which is subject to certification at this time. Whatever management problems remain, this court will rely upon the ingenuity and aid of

counsel and upon the court's plenary authority to control the action. *Janicik,* 305 Pa. Super. at 142, 451 A.2d at 462.

### 3. *Potential for inconsistent adjudications*

Pennsylvania Rule 1708(a)(3) also requires a court to evaluate whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class. In considering the separate effect of actions, the precedential effect of a decision is to be considered as well as the parties' circumstances and respective ability to pursue separate actions. *Janicik,* 305 Pa. Super. at 143, 415 A.2d at 462.

Here, plaintiffs seek to certify a state medical monitoring claim. Such a program would benefit from class certification since each plaintiff's potential recovery is not sufficient to support separate actions and the expense of litigating a medical monitoring claim is substantial. *Redland* at 189 n.6, 696 A.2d at 143 n.6. Given the prospect of a limited damage award and the expense of proving a medical monitoring claim, a class action is the only means asymptomatic plaintiffs have to recover medical monitoring expenses.

Moreover, there is a large risk of inconsistent adjudications due to the complexity and magnitude of the issues and facts involved. As a certified class one case will determine liability and one court would establish all obligations and procedures to administer the fund uniformly.

### 4. *Extent and nature of any pre-existing litigation and the appropriateness of this forum*

Under Pa.R.C.P. 1708(a)(4) and (a)(5), a court should consider the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues. This court finds that this forum is appropriate to litigate the statewide medical monitoring claims because there are a number of individual personal injury cases currently pending in the Mass Tort Program which allege a similar liability claim. This court has a demonstrated record of excellence in managing complex litigation involving mass tort product liability claims. The limited class as certified herein eliminates all personal injury claimants and does not conflict in any way, yet is entirely compatible with management of the thousands of personal injury claims filed in the Philadelphia court.

### 5. *The separate claims of the individual plaintiffs are insufficient in amount to support separate claims or their likely recovery*

Rule 1708 also requires the court to consider the amount of damages sought by the individual plaintiffs in determining the fairness and efficiency of a class action. Thus, a court must analyze whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate amounts. Pa.R.C.P. 1708(a)(6). Alternatively, the rules ask the court to analyze whether it is likely that the amounts which may be recovered by individual class members will be

so small in relation to the expense and effort of administering the action as not to justify a class action. Pa.R.C.P. 1708(a)(7). This criteria is rarely used to disqualify an otherwise valid class action claim. See *Kelly v. County of Allegheny,* 519 Pa. 213, 215, 546 A.2d 608, 609 (1988) (Trial court erred in refusing to certify a class on the grounds that the class members' average claim was too small in comparison to the expenses incurred.). However, in *Klusman v. Bucks County Court of Common Pleas,* (128 Pa. Commw. 616, 631, 564 A.2d 526, 534 (1989)) the court said: "Where the issue of damages does not lend itself to a mechanical calculation, but requires separate mini-trials of a large number of individual claims, courts have found that the staggering problem of logistics make the damage aspect of the case predominate and renders the class unmanageable as a class action. *State of Alabama v. Blue Bird Body Co. Inc.,* 573 F.2d 309 (5th Cir. 1978)."

"To verify that each of the 108,107 claims suffered actual damages, would present an administrative nightmare because of the overwhelming number of transactions between parties that would be required to be examined. *Mekani v. Miller Brewing Co.,* 93 F.R.D. 506 (E.D. Mich. 1982). Petitioners argue these determinations go to the merits. This evaluation of the question of manageability, though ultimately involved with the merits, must be examined in order to determine the efficiency of the class action. *In re Industrial Gas Litigation,* 100 F.R.D. 280 (N.D. Ill. 1983). We recognize that numerous courts have certified classes of large numbers with small amounts of potential recovery." The court therein re-

fused to certify a class whose average recovery would have been $3.55.

Class I has satisfied the criteria for a statewide medical monitoring class under Pa.R.C.P. 1702(a)(6) and (7). Since this court has determined that there has been insufficient evidence presented to certify any unjust enrichment claim as a result of the August 1, 2001 notice to cease use, this court has not determined whether the claims of individual class members will be so small in relation to the expense and effort of administering such action as to preclude class action status. Indeed, the same insufficiency of evidence makes any such determination impossible.

### 6. *Appropriateness of equitable or declaratory relief*

Since plaintiffs seek medical monitoring, it is necessary to consider the criteria set forth in Pa.R.C.P. 1708(b). Under Pa.R.C.P. 1708(b)(2), where equitable relief is sought, a court should consider whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class. *Id.* In their amended complaint, plaintiffs outline a general pattern of behavior by the defendants that would generally make medical monitoring appropriate under this rule.

Having weighed the Rule 1702 requirements, this court finds that a class action is a fair and efficient method for adjudicating plaintiffs' medical monitoring claim. Accordingly, this court makes the following conclusions of law.

## CONCLUSIONS OF LAW

(1) The classes are sufficiently numerous that joinder of all its members would be impracticable.

(2) There are questions of law and fact common to Class I with respect to the medical monitoring claim and as to a limited class with respect to the unjust enrichment claim.

(3) Individual questions of fact exist as it pertains to Class I claims for violation of the UTPCPL.

(4) Individual issues of law and fact exist as it pertains to Class II claims for medical monitoring, violation of the UTPCPL and unjust enrichment, Class III claims for negligence and unjust enrichment and Class IV negligence and unjust enrichment claims.

(5) The claims raised by Arthur Conner, Milton Angert, and Lisa Frost, the representatives for Class I, are typical of those claims belonging to absent class members as it pertains to the medical monitoring claims only. The claims raised by Arthur Conner, Milton Angert and Lisa Frost are not typical of those claims belonging to absent class members as it pertains to the unjust enrichment claim.

(6) Plaintiffs will fairly and adequately assert and protect the interests of Class I under the criteria set forth in Pa.R.C.P. 1709.

(7) Allowing Class IV's claim for medical monitoring to proceed as a class action provides a fair and efficient method for adjudication of the criteria set forth in Pa.R.C.P. 1708.

## CONCLUSION

For these reasons, this court grants in part and denies in part plaintiffs' motion for class certification as follows:

(1) A class is hereby certified and defined as follows:

"Class I—All persons in the Commonwealth of Pennsylvania who were prescribed and ingested Baycol, also known as Cerivastatin, who have not been diagnosed with rhabdomyolysis or congestive heart failure. This class seeks, among other relief, medical monitoring benefits for inter alia, testing for CoQ10 depletion, elevated CK levels, chest x-rays to determine to what extent they may suffer from latent injury or may develop injury in the future in order to provide timely appropriate medical care, a court-supervised monitoring program, epidemiological research benefits for scientists to further understand the effects of Baycol and other equitable relief."

(2) Arthur Conner, Milton Angert, and Lisa Frost are the class representatives for Class I.

(3) Plaintiffs' counsel are appointed as counsel for the class.

(4) The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within 30 days from the date of this order.

A contemporaneous order consistent with this opinion is filed.

## ORDER

And now, November 18, 2004, upon consideration of plaintiffs' motion for class certification, all responses in

opposition, the respective memoranda, all matters of record, and in accordance with the contemporaneous memorandum opinion, it hereby is ordered and decreed as follows:

(1) Plaintiffs' motion for class certification is granted in part, denied in part.

(2) A class is hereby certified and defined as follows:

"Class I—All persons in the Commonwealth of Pennsylvania who were prescribed and ingested Baycol, also known as Cerivastatin, who have not been diagnosed with rhabdomyolysis or congestive heart disease. This class seeks, among other relief, medical monitoring benefits for inter alia, testing for CoQ10 depletion, elevated CK levels, chest x-rays to determine to what extent they may suffer from latent injury or may develop injury in the future in order to provide timely appropriate medical care, a court-supervised monitoring program, epidemiological research benefits for scientists to further understand the effects of Baycol and other equitable relief."

(3) Arthur Conner, Milton Angert, and Lisa Frost are the class representatives for Class I.

(4) Plaintiffs' counsel is appointed as counsel for the class.

(5) Certification is denied as to all other classes.

(6) The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within 30 days from the date of this order.